IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 19, 2000 Session

# BIO-MEDICAL APPLICATIONS OF TENNESSEE, INC., ET AL. v. K.R. CHARY, M.D., ET AL.

**An Appeal from the Chancery Court for Madison County**
**No. 52702     Joe C. Morris, Chancellor**

————————————

**No. W1999-01727-COA-R3-CV - Filed October 13, 2000**

————————————

This is a lawsuit to enforce covenants not to compete. The plaintiffs are private companies that own and operate dialysis medical clinics in West Tennessee. The plaintiffs brought an action against the defendant physicians to enforce covenants not to compete contained in agreements for the sale of the dialysis clinics and other related employment agreements. The trial court granted summary judgment to the physicians on the ground that the covenants are void because they are contrary to public policy. We affirm in part, reverse in part, and remand, finding the covenants enforceable to the extent that they do not prevent the defendant physicians from practicing medicine in their specialty.

**Tenn.R.App.P. 3; Judgment of the Chancery Court is Affirmed in Part, Reversed in Part, and Remanded.**

HOLLY KIRBY LILLARD, J., delivered the opinion of the court, in which DAVID R. FARMER, J. and DAVID G. HAYES, SP. J., joined.

Steven A. Riley and John R. Jacobson, Nashville, Tennessee, for the Appellants Bio-Medical Applications of Tennessee, Inc. and National Medical Care, Inc.

J. Houston Gordon, Covington, Tennessee, for the Appellee K.R. Chary, M.D., Irma Merrill, Memphis, Tennessee, for the Appellee Alagiri Swamy, M.D., Paul F. Rice, Jackson, Tennessee, for the Appellee Ramesh Sarva, CPA, and J. Graham Matherne, Nashville, Tennessee, for the Appellee Tennessee Dialysis Clinics, Inc.

Catherine B. Clayton, Jackson, Tennessee, for the Appellee Shirish Joglekar, M.D.

**OPINION**

In this lawsuit to enforce covenants not to compete, the Plaintiff/Appellant Bio-Medical Applications of Tennessee, Inc. ("BMA") and its parent company, Plaintiff/Appellant National Medical Care, Inc., own and operate kidney dialysis clinics in West Tennessee. Defendant/Appellees Dr. K.R. Chary, Dr. Alagiri Swamy, and Dr. Shirish Joglekar are physicians specializing in nephrology in the Memphis and Jackson areas. Nephrology is the care and treatment of patients with renal disease, including the use of dialysis. Dialysis is a process by which patients with diseased kidneys have wastes and other dissolved materials removed from the body. *See* 42 C.F.R. §405.2102 (2000). Patients with "end-stage renal disease" suffer chronic kidney failure and require regular dialysis treatment in order to survive. *See id.*

Prior to January 1, 1990, Dr. Chary owned and operated dialysis clinics located in West Tennessee, in Jackson, Humboldt, Brownsville and Bolivar. The clinics were owned and operated solely by Dr. Chary, who also served as the clinics' medical director.[1] Dr. Chary maintained an independent medical practice in addition to owning and operating the clinics. On January 1, 1990, Dr. Chary sold the dialysis clinics to BMA for approximately $1.5 million. As part of the sale, Dr. Chary agreed to a covenant not to compete, which provided:

> . . . the undersigned does hereby covenant and agree for a period of seven (7) years from and after the date hereof not to compete with the dialysis centers . . . and that during that time the undersigned neither individually or with others will engage directly or indirectly, either as principal, agent, proprietor, shareholder, director, officer or employee or participate in the ownership, management, operation or control of any hemodialysis facility within a distance of seventy-five (75) miles from Jackson, Humboldt, Brownsville and Bolivar, Tennessee.

The record indicates that BMA paid Dr. Chary $335,000 specifically for his agreement to sign this covenant not compete. Dr. Chary also entered into a "Consulting and Profit-Sharing Agreement" with BMA, in which he agreed to serve as the medical director of the clinics, for which he would receive a monthly fee of $3,000. In addition, Dr. Chary would receive fifteen percent of the net, pre-tax earnings of the clinics if that amount was greater than $36,000 per year.[2] The consulting agreement contained a separate covenant not to compete which included prohibitions similar to those in the sale agreement. The covenant in the consulting agreement extended two years past the termination of the contract and applied to any dialysis facility within seventy-five miles of any facility owned by BMA. It also prohibited Dr. Chary from disclosing BMA's trade secrets or other confidential information.

---

[1] Federal law requires dialysis clinics to have a licensed nephrologist on staff to serve as a medical director. *See* 42 C.F.R. § 405.2136(f) and (g).

[2] In the event that Dr. Chary received fifteen percent of the clinics' earnings, the $3,000 monthly fee ($36,000 per year) would be charged against that amount.

In May 1991, Dr. Chary decided to pursue a business opportunity overseas. Consequently, Dr. Chary and BMA mutually agreed to terminate the consulting agreement. Dr. Chary later returned to the United States and informed BMA that he had become an employee of Dr. Alagiri Swamy, a nephrologist practicing in the Memphis and Jackson areas. Dr. Chary suggested to BMA that his medical director agreement be assigned to Dr. Swamy. As a result, Dr. Swamy entered into an "Administrative Consulting Services Agreement" with BMA in which he agreed, for a fee of $340,000 over two years, to serve as medical director of the clinics in Jackson, Humboldt, Brownsville and Bolivar. The agreement contained a covenant not to compete, which provided:

> During the term of this Agreement and for the period through December 31, 1997 thereafter, Consultant will not engage, directly or indirectly, either as principal, agent, independent contractor, proprietor, shareholder, director, officer or employee or participate in the ownership, management, operation or control of any hemodialysis facility within a distance of twenty (20) miles from the Centers.

After Dr. Swamy assumed the medical director position at the Jackson area clinics, he formed an arrangement with Dr. Chary and Dr. Shirish Joglekar, another Jackson nephrologist, whereby the two doctors performed some of Dr. Swamy's medical director duties.

On November 1, 1994, BMA purchased from Dr. Swamy a dialysis clinic located in Memphis, Tennessee. In connection with the sale, Dr. Swamy agreed to a covenant not to compete. This covenant provided:

> [f]or a period of eight years after [November 1, 1994], Seller will not engage, directly or indirectly, either as principal, agent, proprietor, shareholder, owner or partner, or participate in the ownership, management, operation or control of any hemodialysis facility, acute dialysis business, or home dialysis training, support, or supplies services business within 75 miles of any of the Center's locations.

Dr. Swamy also entered into an "Administrative Consulting Service Agreement" in which he agreed to serve as medical director of the Memphis clinic for a period of eight years in exchange for $525,000. This agreement contained an additional non-compete covenant. It provided:

> During the term of this Agreement and for the period of 2 years thereafter, Consultant will not engage directly or indirectly, either as principal, agent, independent contractor, proprietor, shareholder, director, officer or employee or participate in the ownership, management, operation or control of any hemodialysis facility within a distance of 75 miles from the Center.

The non-compete covenants contained in the consulting agreements, as well as the covenant contained in the sale agreement between Dr. Swamy and BMA, included a provision which defined the activities the physicians were prohibited from performing at clinics not owned and operated by BMA. The provision stated that:

. . . [P]rohibited participation shall include seeing, treating or caring for patients at any other dialysis facility for which services Consultant shall receive payment, directly or indirectly, from such facility or any other source, which payment exceeds the usual and customary fee chargeable by a physician for such services to the patient, or to the patient's public or private insurer(s). In addition, such prohibited participation shall also encompass those dialysis patients [sic] related activities that are performed by [NMC] and its subsidiaries, which include, but are not limited to home-training and support services, laboratory services, CAPD services, EKG, nerve conduction velocity tests, bone densitometry, Doppler Flow Testing, self-care and acute dialysis treatment programs, the distribution and sale of dialysis equipment and supplies, and home health care, including intravenous therapies, respiratory and durable medical equipment supplies and services .

All of the covenants, except for the covenant contained in the sale agreement between Dr. Chary and BMA, note that "[i]t is understood and agreed by the parties hereto that [Appellees are] medical doctor[s] and [their] livelihood depends on [their] ability to practice as . . . medical doctor[s] in that specialty in which [they are] presently practicing." In addition, the consulting agreements signed by Drs. Chary and Swamy contain provisions stating that:

Consultant will remain as a practicing physician in the communities serviced by the Centers and will be available for visits to the Centers and consultation regarding the Centers. It is understood and agreed, however, that Consultant is an independent contractor and that he is not an employee of the Company, and that he shall not be required to devote his entire working hours to his duties hereunder, but that he will continue the practice of medicine on his own behalf which practice is a wholly separate professional activity of Consultant.

In 1996, Dr. Chary, Dr. Swamy and Dr. Joglekar opened five new dialysis clinics in West Tennessee, called Tennessee Dialysis Clinics. They were assisted by Ramesh Sarva, a business advisor and self-employed accountant in New York City. The Tennessee Dialysis Clinics performed the same function as the dialysis clinics operated by BMA.

On December 30, 1996, BMA filed a lawsuit against Dr. Chary, Dr. Swamy, Dr. Joglekar, and Ramesh Sarva seeking damages for breach of the non-compete covenants, conspiracy to breach the non-compete covenants, breach of the duty of loyalty, unfair competition, conspiracy to breach the duty of loyalty and to compete unfairly, and misappropriation of trade secrets. In its complaint, BMA alleged that Appellees conspired to unfairly compete with BMA by opening their own hemodialysis clinics in the Jackson area, called Tennessee Dialysis Clinics ("TDC"), in violation of the non-compete covenants to which Dr. Chary and Dr. Swamy had agreed, as well as other contractual and common law duties. BMA claimed that Appellees, while still practicing at BMA clinics, improperly solicited BMA employees to leave their employment with BMA and work at TDC clinics. BMA also alleged that Appellees persuaded patients receiving dialysis treatment at

BMA clinics to begin receiving treatment at TDC clinics. The parties pursued discovery, including the depositions of BMA executives as well as Drs. Chary, Swamy and Joglekar.

Joseph Ruma, a vice-president at BMA, testified in his deposition that there is a medical director appointed for each dialysis clinic. The medical director oversees the clinic's staff, training and policies, selects supplies and equipment, informs BMA about the clinic's operation, and plans for new business. He stated that medical directors are treated as independent contractors and are paid a salary by BMA. He testified that BMA does not prohibit its medical directors from engaging in the private practice of medicine and that Dr. Chary and Dr. Swamy maintained private practices apart from their duties at BMA. He noted that "a lot" of BMA's medical directors maintain a private medical practice in addition to their duties as medical directors.

Dr. Chary acknowledged in his affidavit that he has maintained his nephrology practice in the Jackson area since 1980. He testified that, after he decided to leave the BMA clinics in 1996, he contacted his patients and invited them to continue seeing him at the Tennessee Dialysis Clinics or at other clinics. Dr. Chary also stated that he informed his patients that he would continue to be their physician regardless of which dialysis clinic they chose to use. Dr. Chary acknowledged soliciting BMA employees to join his new clinics, prior to leaving BMA.

In his affidavit, Dr. Swamy acknowledged that he has practiced medicine in the Memphis and West Tennessee areas since 1982, and also that he continued to practice medicine while serving as medical director at BMA's facilities. He testified that he served as medical director at BMA's dialysis clinics in Jackson, Bolivar, Humboldt and Brownsville from 1991 through December 1996. At the time of his affidavit, he was medical director only at BMA's Memphis clinic. Dr. Swamy stated that he had no formal contract with Dr. Chary and Dr. Joglekar to perform his medical director duties at the Jackson area clinics, but that he paid the two doctors based on Joseph Ruma's suggestion that they share in Dr. Swamy's medical director compensation.

Dr. Joglekar testified in his deposition that he had practiced nephrology in the Jackson area continuously since 1991. He stated that Dr. Swamy hired him as an employee to assist in treating Dr. Swamy's patients and Dr. Chary's patients while Dr. Chary was overseas. Dr. Joglekar stated that he started his own independent practice in 1992 or 1993 when Dr. Chary left his position as Dr. Swamy's employee. Dr. Joglekar testified that he was aware of the covenants not to compete that Dr. Chary and Dr. Swamy entered into with BMA, and acknowledged that such covenants are "common practice all over the country." Dr. Joglekar was named as the medical director for the Tennessee Dialysis Clinic in Selmer, Tennessee. He testified that he talked with Mr. Sarva and Dr. Chary about a "possible" equity position in the new corporation.

On July 17, 1998, Dr. Chary, Dr. Swamy, Sarva and TDC moved for summary judgment. These Defendants asserted that the non-compete covenants contained in the sale and medical director agreements violated public policy. The Defendants asserted that the covenants forced Dr. Chary and

Dr. Swamy to treat their patients at BMA clinics and, conversely, if a patient chose to receive dialysis treatment at a facility not owed and operated by BMA, the patient would be forced to have his dialysis treatment overseen by a physician other than Dr. Chary or Dr. Swamy. The Defendants contended there is a public policy against restraining competition and restricting open access to dialysis treatment, equipment and services, or inhibiting patient choice of physicians and treatment facilities in dialysis and the treatment of chronic renal failure.

In support of the claim of a public policy with regard to the practice of nephrology, the Defendants cited three state statutes. The first, Tennessee Code Annotated § 68-35-101, directs the Tennessee Department of Health to establish a program to assist persons suffering from chronic renal disease who are unable to pay for their own care and treatment on a continuing basis. Tenn. Code Ann. §68-35-101(a) and (b) (1996). The statute establishes a renal disease advisory committee to consult with the Department, *see* Tenn. Code Ann. § 68-35-102, and directs the Department to:

> (1) With the advice of the renal disease advisory committee, develop standards for determining eligibility for care and treatment under this program;
>
> (2) Assist in the development and expansion of programs for the care and treatment of persons suffering from chronic renal diseases, including dialysis and other medical procedures and techniques which will have a lifesaving effect in the care and treatment of persons suffering from these diseases;
>
> (3) Assist in the development of programs for the prevention of chronic renal diseases;
>
> (4) Extend financial assistance to persons suffering from chronic renal diseases in obtaining the medical, nursing, pharmaceutical, and technical services necessary in caring for such diseases, including the renting of home dialysis equipment;
>
> (5) Assist in equipping dialysis centers; and
>
> (6) Institute and carry on an educational program among physicians, hospitals, public health departments, and the public concerning chronic renal diseases, including the dissemination of information and the conducting of educational programs concerning the prevention of chronic renal diseases and the methods for the care and treatment of persons suffering from these diseases.

Tenn. Code Ann. § 68-35-103. The Defendants contended that the statute establishes a public policy to encourage expansion in the provision of treatment and dialysis care to renal disease patients. BMA argued that the sole public policy intended by the statute is to ensure that indigent patients suffering from renal disease are provided with medical care regardless of their ability to pay.

The second statute cited by the Defendants, Tennessee Code Annotated § 49-9-702, is directed to the medical units of the University of Tennessee and provides for the establishment of medical education centers in Washington, Sullivan and Hamilton Counties. Tenn. Code Ann. § 49-9-702(a)(1) (1996). Subsection (c) of the statute states:

> The University of Tennessee medical units are responsible for planning the further development of other educational programs designed to achieve a better distribution of physicians into nonmetropolitan areas of Tennessee where a shortage of doctors currently exists, and are authorized and directed to . . . develop statewide programs for medical education . . . to increase the supply and achieve a better distribution of physicians in Tennessee.

Tenn. Code Ann. § 49-9-702(c). The Defendants argued that the statute evidences a "key public priority" of encouraging physicians to practice medicine in under-served, nonmetropolitan areas. BMA countered that the intent of the statute is simply to achieve a better distribution of physicians in nonmetropolitan areas of the state through the use of education programs where a shortage of doctors currently exists.

The third statute cited by Appellees, Tennessee Code Annotated § 47-25-101, provides:

> All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into this state, . . . and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are declared to be against public policy, unlawful, and void.

Tenn. Code Ann. § 47-25-101(1995). The Defendants argued that the non-compete covenants restrain competition in the provision of dialysis treatment, and asserted that the covenants effectively barred competitors from entering the dialysis market, all in light of the state and national shortage of nephrologists and federal Medicare provisions requiring that a licensed nephrologist serve as medical director at any dialysis clinic. *See* 42 C.F.R. § 405.2136(f). BMA argued that Tennessee courts have consistently held that non-compete agreements are not prohibited under restraint of trade statutes and that they are enforceable against medical professionals.

In support of their public policy argument, the Defendants also cited 42 C.F.R. § 405.2110(a)(2000), which states that the federal Health Care Financing Administration's designation of end-stage renal disease treatment networks does not "limit [a dialysis patient's] choice of physician or facilities, or preclude patient referral by physicians to a facility in another designated network." They also cited 42 U.S.C. § 1395a (2000), a section within the Social Security Act, which provides that:

> [a]ny individual entitled to insurance benefits under this subchapter may obtain health services from any institution, agency, or person qualified to participate under this subchapter if such institution, agency, or person undertakes to provide him services.

*Id.* The Defendants argued that the non-compete covenants violate these state and federal public policies by limiting patient access to nephrologists and to dialysis treatment in under-served areas. They asserted that the covenants prevent them from practicing medicine at any non-BMA clinic in a geographic area that is under-served by nephrologists. To support the argument that there is a shortage of nephrologists in West Tennessee, the Defendants proferred the deposition testimony of Dr. Shyamal Sarkar, a medical director at one of BMA's facilities, who testified that there was a shortage of nephrologists in the United States and in West Tennessee as compared to the northeastern United States, where he had practiced for several years. BMA contended that Dr. Sarkar's testimony was unreliable because Dr. Sarkar had only been present in Jackson for nine days when his deposition was taken and, at any rate, his deposition established only that there is a shortage of nephrologists in West Tennessee as compared to an undetermined location in the northeastern United States.

By letter to counsel for the parties dated September 29, 1998, the trial court granted Appellees' motion for summary judgment. In the letter, the trial court stated that the non-compete covenants violate state public policy and that they are void on their face. The trial court found also that the covenants "prohibit[] the doctors in question from performing their specialty and, therefore, [are] detrimental to the patients in this area that rely on their unique training and skills."

On October 19, 1998, the trial court entered an order granting the motion for summary judgment with respect to BMA's claims for unfair competition, conspiracy to unfairly compete, breach of the non-compete covenants, conspiracy to breach the non-compete covenants, breach of the duty of loyalty, and conspiracy to breach the duty of loyalty. In the order, the trial court stated that the covenants "unduly restrict, if not prohibit, the doctors . . . from performing their specialty and [that the covenants] are detrimental to the patients in this area who rely on their physicians' unique training and skills." The trial court did not dismiss BMA's misappropriation of trade secrets claim.

On November 4, 1998, BMA filed a motion requesting that the trial court alter or amend its order of summary judgment in favor of Dr. Chary, Dr. Swamy, Mr. Sarva, and TDC or, in the alternative, to enter the judgment as a final judgment. In the motion, BMA argued that the non-

compete covenants do not prevent Dr. Chary and Dr. Swamy from practicing medicine or from receiving their full professional fee for treating patients. They asserted that the covenants only prevent Drs. Chary and Swamy from having a business interest in the ownership of a dialysis clinic. BMA also argued that there is no specific public policy prohibiting physicians from agreeing to non-compete covenants. BMA asserted that Appellees failed to produce evidence of any shortage of nephrologists or dialysis clinics in West Tennessee and that no such shortage exists. Along with the motion to alter or amend, BMA filed the affidavit of Gary Coyle, a regional manager with BMA, who testified that there was no shortage of nephrologists in West Tennessee and that the restrictive covenants did not prohibit the doctors from practicing medicine at a non-BMA facility.

On February 19, 1999, the trial court entered an order denying BMA's motion to alter or amend the trial court's grant of summary judgment. In the order, the trial court reasoned that the motion to alter or amend should be denied because the arguments on which it was based were identical to those advanced at the hearing on the Defendants' motion for summary judgment. The trial court also found Coyle's affidavit untimely because he was available prior to the summary judgment hearing and because his affidavit contained no information that was not known prior to the hearing. Consequently, the trial court directed that the summary judgment in favor of Dr. Chary, Dr. Swamy, Mr. Sarva, and TDC be entered as a final judgment. On March 8, 1999, the trial court also granted summary judgment in favor of Dr. Joglekar on BMA's conspiracy claim. The order directed the judgment as to Dr. Joglekar to be entered on the record as a final judgment. From the trial court's orders granting summary judgment and its order denying the motion to alter or amend, BMA now appeals. The trial court's refusal to dismiss BMA's misappropriation of trade secrets claim is not at issue in this appeal.

On appeal, BMA argues that the trial court erred in granting the Appellees' motion for summary judgment because the state statutes, the federal statute, and the federal regulations cited by Appellees do not establish a public policy that would prohibit the execution of covenants not to compete by nephrologists such as Drs. Chary and Swamy. BMA also contends that the evidence proffered by the Appellees in support of their motion for summary judgment does not establish, as a matter of law, that there is a shortage of nephrologists and dialysis clinics in West Tennessee. Finally, BMA asserts that, even if there is a public policy such as that argued by the Appellees, the covenants in this case do not violate it because they clearly do not prevent Drs. Chary and Swamy from practicing nephrology in the affected communities. They contend that the restrictive covenants should be interpreted to prohibit Drs. Chary and Swamy only from receiving a fee in excess of the usual and customary fees for their medical services, or from receiving fees for clinical services, such as support services or providing equipment, from a clinic not operated by BMA

The Appellees maintain that the state statutes, the federal statute, and the federal regulations they have cited reflect an important public policy favoring increased access to nephrologists, dialysis facilities, and treatment for chronically ill, end-stage renal disease patients, and that any contractual restriction or limitation on such availability or treatment would void the entire contractual provision. The Appellees insist that the covenants not to compete can only be interpreted as prohibiting Dr. Chary and Dr. Swamy from owning dialysis equipment for use in their own office, from renting such

equipment to patients, and from other activities incident to the practice of nephrology, in effect preventing them from practicing nephrology at a dialysis clinic not owned and operated by BMA. Dr. Joglekar has filed a separate brief on appeal arguing that the appeal is "frivolous" as it applies to him because he has never signed a covenant not to compete with BMA.

Our standard of review is clear and well-settled. A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. *See* Tenn.R.Civ.P. 56.04. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the non-moving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *See id.* In *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993), our Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. . . . In this regard, Rule 56.05 [now Rule 56.06] provides that the nonmoving party cannot simply rely upon his pleadings but must set forth *specific facts* showing that there is a genuine issue of material fact for trial.

*Id.* at 211 (citations omitted) (emphasis in original).

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *See Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995). Since only questions of law are involved, there is no presumption of correctness regarding a trial court's grant of summary judgment. *See Bain*, 936 S.W.2d at 622. Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. *See Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn. 1997).

In this appeal, both Appellants and Appellees advocate an "all-or-nothing" approach, in which the covenants at issue must be held void *in toto* as repugnant to public policy, or upheld in their entirety as not infringing in any way on the Defendant physicians' ability to practice nephrology or provide necessary services to patients. The trial court, of course, held the covenants void in their entirety as contrary to public policy. We must explore whether either approach is appropriate for resolution of the issues on appeal.

When a court voids a portion of a contract term because it is contrary to public policy, the court may nevertheless enforce the remaining portions of the term so long as the party seeking enforcement obtained it in good faith and in accordance with reasonable standards of fair dealing. *See* Restatement (Second) of Contracts § 184(2)(1981); *Canal Ins. Co. v. Ashmore*, 126 F.3d 1083, 1087 (8th Cir. 1997)(holding that an exclusion in an insurance policy was void only to the extent that it contravened Arkansas' public policy of providing $25,000 in bodily injury coverage); *Nichols v.*

*Anderson*, 837 F.2d 1372, 1376 (5th Cir. 1988) (holding that a "radius-exclusion clause" in an automobile insurance policy was void only to the extent required to meet the Arkansas public policy of requiring $25,000 in liability coverage). *See also Central Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28, 37 (Tenn. 1984) (stating that "[p]artial enforcement involves much less of a variation from the effects intended by the parties than total nonenforcement would. If the arguments in favor of partial enforcement are convincing, no court need hesitate to give them effect.") (citation omitted). There is no contention here that BMA acted in bad faith or violated reasonable standards of fair dealing in obtaining the doctors' agreement to the covenants.

Therefore, even assuming (without deciding) that the statutes and regulations cited by the Appellees establish the public policy asserted, and assuming further that the covenants at issue are in part repugnant to such a public policy, it is unnecessary to void the covenants in totality. Appellees do not, indeed cannot, argue that every activity prohibited by the covenants is necessary in order for them to continue practicing nephrology in West Tennessee at dialysis clinics not operated by BMA. BMA asserts that Drs. Chary and Swamy established, owned and operated dialysis clinics which directly competed with the clinics sold to BMA, and that prior to leaving BMA, they actively and overtly solicited BMA employees to leave the BMA-operated clinics to work for the competing clinics. Assuming *arguendo* the adoption of the public policy arguments put forth by Appellees, such conduct would clearly not be protected. Thus, the Court may void only the portions of the covenants not to compete that would prevent Drs. Chary and Swamy from treating renal disease patients at clinics not operated by BMA, and from providing services customarily incident to the practice of nephrology in West Tennessee.

This approach is consistent with the established judicial approach to covenants not to compete. At one point, such restrictive covenants were considered under the "all or nothing" rule whereby "a court either enforces the contract as written or rejects it altogether." *Central Adjustment,* 678 S.W.2d at 36. However, in *Central Adjustment*, the Tennessee Supreme Court rejected the "all or nothing" approach in favor of the "rule of reasonableness," described as follows:

> This rule provides that unless the circumstances indicate bad faith on the part of the employer, a court will enforce covenants not to compete to the extent that they are reasonably necessary to protect the employer's interest "without imposing undue hardship on the employee when the public interest is not adversely affected."

*Id.* at 37 (quoting *Ehlers v. Iowa Warehouse Co.*, 188 N.W.2d 368, 370 (Iowa 1971)). Thus, given the "special nature of covenants not to compete," the Court can "modify and enforce the covenant on reasonable terms." *Central Adjustment*, 678 S.W.2d at 37. Therefore, regardless of whether the covenants not to compete in this case are viewed in the context of public policy considerations or reviewed to determine if they are unreasonable, the Court may order the covenants enforced insofar as they are reasonable and not repugnant to established public policy, holding the remainder of the covenants void and unenforceable.

In this case, Drs. Chary and Swamy have a protectable interest in maintaining a private practice in nephrology in West Tennessee, and the ability to treat patients with renal disease at dialysis clinics other than those owned and operated by BMA. This is set out expressly in some of the agreements executed by Drs. Chary and Swamy, in which BMA acknowledged that each:

> . . . will remain as a practicing physician in the communities serviced by the Centers
> and will . . . continue the practice of medicine on his own behalf. . . .

This is consistent with the parties' course of dealing since the sale of the dialysis clinics to BMA, prior to the decision by Drs. Chary and Swamy to open the competing Tennessee Dialysis Clinics. It is undisputed that Dr. Swamy continued to practice nephrology in West Tennessee since 1982, and Dr. Chary maintained a continuous practice in nephrology in West Tennessee since 1980, except for a brief period in 1990-91 in which he was out of the country. Moreover, Tennessee recognizes that a covenant not to compete may be void as against public policy if it prevents the employee from pursuing his occupation. *See Allright Auto Parks, Inc. v. Berry*, 409 S.W.2d 361, 364 (Tenn. 1966) (holding that a covenant was unreasonable because it restricted employee from working in forty-six cities throughout the United States and Canada); *Turner v. Abbott*, 94 S.W. 64, 66 (Tenn. 1906) (citing *Oregon Steam Navigation Co. v. Windsor*, 87 U.S. 64, 68 (1873) for the proposition that an employee non-compete covenant should not preclude the employee from pursuing his occupation and supporting his family). Thus, the reasonableness of the covenants at issue must be viewed with respect to the legitimate interest of Drs. Chary and Swamy in remaining in private practice in nephrology in West Tennessee, with the ability to treat patients with renal disease at dialysis clinics not owned and operated by BMA.

This interest is commensurate with the public policy asserted by the Appellees. Relying on state and federal statutes and federal regulations, the Appellees assert a public policy favoring increased access by patients with renal disease to treatment programs, including dialysis, encouraging physicians to practice medicine in underserved areas in Tennessee, and protecting patients' free choice of physicians and facilities. This asserted public policy dovetails with the legitimate interest of Drs. Chary and Swamy in continuing to practice nephrology in West Tennessee and in retaining the ability to treat renal disease patients at non-BMA dialysis clinics, recognized in the parties' agreements and consistent with their course of dealing. Consequently, it is unnecessary to decide whether the statutes and regulations evidence the public policy asserted by Appellees; the Court may simply focus on whether the covenants unreasonably prevent Drs. Chary and Swamy from continuing to practice nephrology in West Tennessee and treat patients at dialysis clinics not owned by BMA.

Covenants not to compete are generally disfavored because they are in restraint of free trade. *See Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471, 472 (Tenn. 1984). However, Tennessee courts have declined to hold that non-compete covenants are invalid per se and will enforce them so long as they are reasonable. *See id. See also Central Adjustment*, 678 S.W.2d at 32-33; *Greene County Tire and Supply, Inc. v. Spurlin*, 338 S.W.2d 597, 599-600 (Tenn. 1960); *Medical Educ. Assistance Corp. v. State*, 19 S.W.3d 803, 814 (Tenn. Ct. App. 1999); *Hogan v. Coyne Int'l Enters. Corp.*, 996

S.W.2d 195, 204 (Tenn. Ct. App. 1998). To determine whether a noncompete covenant is reasonable:

> There is no inflexible formula for deciding the ubiquitous question of reasonableness . . . . Each case must stand or fall on its own facts. However, there are certain elements which should always be considered in ascertaining the reasonableness of such agreements. Among these are: the consideration supporting the agreements; the threatened danger to the employer in the absence of such an agreement; the economic hardship imposed on the employee by such a covenant; and whether or not such a covenant should be inimical to the public interest.

*Hasty*, 671 S.W.2d at 472-73 (quoting *Allright Auto Parks*, 409 S.W.2d at 363).

Covenants not to compete may arise from the sale of a business or from an employment contract. In *Greene County Tire and Supply, Inc. v. Spurlin*, the Tennessee Supreme Court stated that covenants incidental to the sale of a business are "lawful and enforceable . . . provided [they] are reasonable and *go no further than affording a fair protection to the buyer*." 338 S.W.2d at 600 (citations omitted) (emphasis added). A restrictive covenant protects the buyer from a seller who might open a competing business to attract former customers. The reasonableness of the covenant not to compete "is to be determined by reference to the nature of the business, the manner in which it has been conducted and its territorial extent." *Id.* at 600 (citation omitted).

When a covenant not to compete is executed as part of an employment agreement, the focus is on the employer's interest in maintaining confidential information and customer relationships, balanced against the employee's interest in obtaining fair market value for his labor. *See Hasty*, 671 S.W.2d at 473. The Court in *Hasty* noted:

> Of course, any competition by a former employee may well injure the business of the employer. An employer, however, cannot by contract restrain ordinary competition. . . . In order for an employer to be entitled to protection, there must be special facts present over and above ordinary competition . . . . These special facts must be such that without the covenant not to compete the employee would gain an unfair advantage in future competition with the employer.

*Id.* at 473 (citations omitted).

In this case, each non-compete covenant executed by Dr. Chary or Dr. Swamy states that he:

> . . . will not engage, directly or indirectly, either as principal agent, independent contractor, proprietor, shareholder, director, officer or employee or participate in the ownership, management, operation or control of any hemodialysis facility. . . .

The geographic territory stated in the covenants varies somewhat. A non-compete executed by Dr. Swamy includes, in addition to any hemodialysis facility, any "acute dialysis business, or home dialysis training support or supplies services business. . . ." Both Drs. Chary and Swamy executed agreements which defined the activities prohibited under the covenants:

> For the purposes [of the covenant not to compete], such prohibited participation shall include seeing, treating or caring for patients at any other dialysis facility for which services Consultant shall receive payment, directly or indirectly, from such facility or any other source, which payment exceeds the usual and customary fee chargeable by a physician for such services to the patient, or to the patient's public or private insurer(s). In addition, such prohibited participation shall also encompass those dialysis patients [sic] related activities that are performed by [NMC] and its subsidiaries, which include, but are not limited to home-training and support services, laboratory services, CAPD services, EKG, nerve conduction velocity tests, bone densitometry, Doppler Flow Testing, self-care and acute dialysis treatment programs, the distribution and sale of dialysis equipment and supplies, and home health care, including intravenous therapies, respiratory and durable medical equipment supplies and services . . . .

On appeal, BMA argues that the definition of "prohibited participation" only prohibits Drs. Chary and Swamy from receiving a payment from a non-BMA clinic for seeing a patient in the clinic if the payment is an amount that exceeds the usual and customary fee for the physician's services. BMA maintains that the physicians could treat patients and be paid for it, but not profit from the operation of the clinic itself. The Appellees argue that the covenants must be interpreted broadly, that they prohibit Drs. Chary and Swamy from owning a dialyzer, dialysis bed or dialysis equipment for use in their own offices, from renting dialysis equipment to patients for use in the patients' homes, and therefore limit access by patients by preventing the physicians from providing equipment, materials and services necessary for dialysis.

The interpretation of contractual provisions is a question of law. *Eyring v. East Tennessee Baptist Hosp.*, 950 S.W.2d 354, 358 (Tenn. Ct. App. 1997). Questions of law are reviewed on appeal *de novo* by this Court, with no presumption of correctness of the decision of the trial court. *City of Newport v. Masengill Auction Co.*, 19 S.W.3d 789, 792 (Tenn. Ct. App. 1999).

The provisions of a contract should be reviewed in relation to the remainder of the contract, so that the contract is viewed as a whole. *Holmes v. United States Fidelity & Guar. Co.*, 844 S.W.2d 632, 634 (Tenn. Ct. App. 1992). In this case, the definition of "prohibited participation" is

-14-

contained in the same documents that acknowledge that Drs. Chary and Swamy will continue practicing nephrology in the affected areas. Consequently, the definition of "prohibited participation" must be interpreted in a manner consistent with the parties' understanding that Drs. Chary and Swamy would continue practicing nephrology in West Tennessee. Moreover, in determining how to interpret a contract, the court should select an interpretation that can be upheld as reasonable. **_Munford Union Bank v. American Ambassador Cas. Co._**, 15 S.W.3d 448, 451 (Tenn. Ct. App. 1999) (stating that "policies of insurance, *like other contracts*, must receive a reasonable interpretation consonant with the apparent object and plain intent of the parties.") (emphasis added). This is consistent with the severability provision included in the parties' agreements:

> If any term or provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

In this case, the first sentence of the definition of prohibited participation clearly permits Drs. Chary and Swamy to treat patients at a dialysis clinic not owned or operated by BMA so long as they do not receive a payment in excess of the customary physician's fee for those services. The second sentence of the definition lists a number of "dialysis patients [sic] related activities that are performed by National Medical Care, Inc. and its subsidiaries. . . .," apparently prohibiting Drs. Chary and Swamy from providing services for dialysis patients that would normally be provided by a dialysis clinic. The Appellees insist that this prevents Drs. Chary and Swamy from treating renal disease patients, while BMA maintains that it does not.

Thus is posited the factual dispute which must be remanded for determination by the trial court. The ability of Drs. Chary and Swamy to practice nephrology and treat patients at dialysis clinics not owned and operated by BMA is fully protected under the parties' agreements. To the extent that any of the services listed in the definition of "prohibited participation" are necessary and customarily provided by the nephrologist who treats a renal disease patient, rather than by the dialysis clinic, that term of the provision must be deemed void. For example, if home health care equipment for renal disease patients is necessarily and customarily provided to the patient by his nephrologist rather than by the dialysis clinic utilized by the patient, then such a service would be considered incident to the nephrology practice of Drs. Chary and Swamy and must be permitted. To the extent that the covenants not to compete prohibit Drs. Chary and Swamy from providing such a service, they would be deemed void and unenforceable. Likewise, if some participation in the "operation or control" of the dialysis clinic is necessary for the nephrologist to properly treat his patient, then the covenants would be deemed void to the extent that they prohibit Drs. Chary and Swamy from practicing nephrology and treating patients at non-BMA clinics. However, Drs. Chary and Swamy's ownership of dialysis clinics in direct competition with the BMA clinics, and their overt solicitation of BMA employees while still practicing at the BMA clinics, are activities which

are clearly not protected under the terms of the parties' agreements, under any "reasonableness" analysis of the non-compete covenants, or under the public policy arguments put forth by the Appellees.

Therefore, the decision of the trial court must be reversed and the cause remanded. On remand, the trial court will be required, *inter alia*, to conduct a detailed inquiry into which of the activities by Drs. Chary and Swamy that form the basis of BMA's complaint are necessary and incident to their treatment of renal disease patients at a non-BMA clinic, and are therefore protected. To the extent that BMA seeks to apply the covenants not to compete to such activities, the covenants would be deemed void and unenforceable. In all other respects, the covenants not to compete would be unaffected. The trial court may also consider any other factors affecting the overall reasonableness of the covenants.

In light of this holding, Dr. Joglekar's arguments, contending that this appeal is "frivolous" as it applies to him because he has never signed a covenant not to compete with BMA, are pretermitted. To the extent that the covenants are enforceable, issues of fact remain as to whether Dr. Joglekar conspired with the other Appellees to violate the covenants not to compete or committed other legal wrongs in connection with any breach of the covenants.

The trial court's decision not to grant summary judgment as to BMA's allegations of misappropriation of trade secrets was not raised on appeal and is therefore affirmed. As to the remaining issues, the decision of the trial court is reversed and the cause remanded for further proceedings consistent with this Opinion. Costs are assessed equally against Appellants, Bio-Medical Applications of Tennessee, Inc. and its parent company, National Medical Care, Inc., and their surety, and Appellees, Dr. K. R. Chary, Dr. Alagiri Swamy, Dr. Shirish Joglekar, Ramesh Sarva, and Tennessee Dialysis Clinics, Inc., and their surety, for which execution may issue if necessary.

_____
HOLLY KIRBY LILLARD, JUDGE